U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

NOV - 3 2005



ROBERT H. SHEMWELL, CLERK
BY_____
         DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| SALETHA SMITH CLANTON | CIVIL ACTION NO. 03-0130 |
| VERSUS | JUDGE HICKS |
| CITY OF SHREVEPORT | MAGISTRATE JUDGE HORNSBY |

### MEMORANDUM RULING

This matter is before the Court on defendant City of Shreveport's ("COS") "Motion for Summary Judgment" [Doc. No. 21]. COS moves for summary judgment dismissing all of plaintiff's claims. Plaintiff Saletha Smith Clanton ("Clanton") opposes the motion and dismissal of her gender discrimination, hostile work environment and retaliation claims. For the following reasons, the Court finds that there are no genuine issues as to any fact material to this motion, and COS is entitled to judgment as a matter of law.

### BACKGROUND

Clanton was hired as a police officer for the City of Shreveport on March 1, 1996 and remains employed as of the filing date of this motion. [Clanton Deposition, Exhibit A, p. 7]. In the course of her employment, Clanton has accrued a lengthy history of minor disciplinary actions. She has received numerous Supervisor's Action Reports.[1] A SAR merely indicates that the employee has been counseled and serves as a warning to the employee regarding the infraction. [Id.]

---

[1] A Supervisor's Action Report ("SAR") is a step below a Letter of Reprimand, and does not constitute formal discipline under the civil service system. [Clanton Deposition, Exhibit A, p. 15; 81-82].

The Court will not detail all of Clanton's disciplinary record, but a few will be mentioned as illustrations. She received a Letter of Reprimand, constituting formal discipline, in August 1997 for failing to verify that a restraining order had been served, which caused a citizen to be inappropriately taken into custody. [Id., Exhibit A-35]. She also received several SARs for being late or absent. Plaintiff's May 2000 performance evaluation was "unsatisfactory." [Id., Exhibit A-13].

In April of 2001, she was suspended twice. First, for 15 days without pay for violating the department's rules regarding unbecoming conduct and courtesy. [Id. at pp. 200-201; Exhibit A-52]. The second time she received a five (5) day suspension without pay for running a driver's license check on her boyfriend and her boyfriend's ex-fiancee's for personal reasons. [Id., Exhibit A-52]. On November 16, 2001, Captain Alderman issued Clanton a notice regarding her excessive absenteeism for the period between July 2001 and September 2001. [Id., Exhibit A-54].

Clanton complains that in January of 2002, Captain Alderman transferred her from the day shift to the evening shift. [Id. at p. 58]. Although she was told the transfer was because of a manpower shortage, Clanton alleges the transfer was because she was female. [Id. at p. 133; Exhibit A-55]. Clanton had been attending evening classes at Louisiana Tech, but dropped her classes at Tech when she learned of the transfer without talking to Captain Alderman. [Id. at p. 60]. Clanton asked Captain Alderman how to get reimbursed for her lost tuition. [Id., Exhibit A-56]. Clanton found out and passed on to Alderman that it was too late for her to get reimbursed. [Id. at p. 134]. Captain Alderman offered to adjust her days off to allow her to continue her classes, but she had already dropped the classes. [Id.]

In February of 2002, Clanton was drafted to work both weekends of the Mardi Gras Parades. [Id. at pp. 173-174]. Clanton believes that the assignment came from Special Services, and admits it was not from Captain Alderman. [Id.] She asked to be excused from working both of the Mardi Gras parades. [Id.] Her request was denied and she wrote a memo to Captain Alderman stating, "perhaps [she] did not stress the importance of [her] plans on [those] dates" and again asked to be excused from duty. [Id., Exhibit A-58]. Clanton claimed that she needed to take her mother to the hospital in Dallas for testing on one of the weekends. [Id.] Clanton explained that she planned a wedding shower for a friend on the other weekend. [Id.] She also complained of her recent transfer to the evening shift, adding that working the parades would "only increase [her] stress." [Id.]

Captain Alderman responded, reminding her that he had already excused her from working the Independence Bowl. [Id.] Alderman also address her complaints about her transfer. Alderman wrote that the transfer was based upon recommendations by the other officers in her chain of command, as well as her poor attendance, poor productivity, and prior disciplinary complaints. [Id.] Captain Alderman requested further information concerning her mother's treatment and the shower. [Id.] The Department's sick leave policy provides that supervisors are entitled to the name of the doctor, clinic, or hospital who had been consulted or who was treating the illness for which plaintiff sought leave for sickness in family. [Smith Affidavit, Exhibit B, SPD 301.06 at IV(C)(6)(d)].

Clanton did not respond to Captain Alderman's request for information to verify her claims. Instead she filed a complaint against Captain Alderman with the Chief of Police. [Clanton Deposition, Exhibit A-62]. Clanton alleged that her transfer was because she was a single female with no children, that she had been denied tuition reimbursement, had

been drafted to work the Mardi Gras parades on her scheduled days off, and had been asked for her mother's private medical information. [Id.] Her complaint was forwarded to Internal Affairs and to the City Personnel Department for investigation. [Willis Affidavit, Exhibit C; Jackson Deposition[2], pp. 8-10]

Clanton never responded to Captain Alderman, but she did only worked the second Mardi Gras parade. [Clanton Deposition, Exhibit A, p. 174]. Clanton admits that all patrol officers had to work at least one of the Mardi Gras parades. [Id.] In a memo dated February 15, 2004, Captain Alderman inquired as to why Clanton did not provide him the requested information. [Id., Exhibit A-60]. Captain Alderman advised that he no longer needed the information, but asked her to respond to his memo by February 20. [Id.]

Captain Alderman wrote a SAR concerning plaintiff's failure to respond to his January 25 request for information. [Id.] The SAR recommended no further action be taken, but advised that future violations could result in disciplinary action. [Id.]

Plaintiff's complaint against Captain Alderman was investigated including: taking recorded statements from Clanton and several officers in her chain of command, including Captain Gary Alderman, Lieutenant Robert Dowell, Sergeant W.C. Pickett, Sergeant Mike Bailey, and Sergeant Debbie Strickland. [Id.] Based upon the testimony of the witnesses, Clanton's claims were not able to be substantiated. [Willis Affidavit, Exhibit C; Jackson Deposition, pp. 17, 20; Clanton Deposition, Exhibits A-63 & A-64].

In April of 2002, Assistant Chief Franklin selected Clanton for transfer to day shift in Area Four. [Franklin affidavit, Exhibit E]. The transfer also her removed her from

---

[2]COS filed Jackson's deposition as "Supplement to Memorandum in Support of Motion for Summary Judgment" [Doc. No. 33], but did not provide an exhibit number.

Alderman's supervision. [Id.] In fact, Clanton welcomed the transfer as a way to resolve her conflict with Alderman. [Clanton Deposition, Exhibit A, pp. 418-419].

Clanton's new Captain was Donnie Melton. [Melton affidavit, Exhibit F]. Captain Melton assigned Sergeant Cedric Wilson to be Clanton's Administrative Sergeant. [Wilson affidavit, Exhibit D]. Clanton only worked in Area Four for 18 days, during which she had numerous issues concerning her performance. Sergeant Wilson noted these incidents in his Sergeant's Handbook, including absenteeism, rudeness, reckless driving and failure to answer her radio. [Wilson Affidavit, Exhibit D]. The Sergeant Handbook entries did not constitute discipline, nor did they rise to the level of written reprimands. [Id.]

On May 7, 2002, Sergeant Wilson issued a SAR to Clanton because she failed to answer her radio in response to a request for back-up from a fellow officer. [Wilson Affidavit, Exhibit D; Clanton Deposition, Exhibit A-3]. Plaintiff admits that she asked for a tape recording of the radio calls and was able to confirm that she in fact did not answer the call. [Clanton Deposition, Exhibit A, p. 207]. Sergeant Wilson did not recommended any further action, her pay and seniority were not affected and the SAR did not constitute discipline under civil service. [Wilson Affidavit, Exhibit D]. Plaintiff refused to sign the SAR and took leave after seeing a doctor for treatment of "stress related symptoms." [Clanton Deposition, Exhibit A-3]. Plaintiff returned to work on May 24, two weeks later.

On May 13, 2004, two days into plaintiff's two week stress vacation precipitated by the SAR, Captain Melton wrote a memo to Assistant Chief Franklin concerning the performance issues with plaintiff. [Id., Exhibit A-65]. Captain Melton stated that he believed Clanton engaged in unbecoming conduct and suggested that she be issued a SAR. [Id.] At Assistant Chief Franklin directing Captain Melton forwarded the information

concerning plaintiff's conduct to the Internal Affairs Bureau ("IAB") for investigation. [Franklin Affidavit, Exhibit E; Clanton Deposition, Exhibit A-65].

Clanton returned to work on Friday, May 24, 2002. [Id.] Captain Melton called a meeting with plaintiff, Lieutenant K. Jackson, Lieutenant J. Davis, and Sergeant Wilson to discuss the Internal Affairs complaint Melton filed against Clanton. [Melton Affidavit, Exhibit F; Clanton Deposition, Exhibit A-65]. Clanton alleges that Captain Melton shouted at her, called her lazy and stupid, and advised that he was filing a complaint with Internal Affairs. Clanton Deposition, Exhibit A-3]. Upon leaving she alleges to have had a "panic attack" and went to the hospital because she felt nauseous and was dry heaving and having chest pains. [Clanton Deposition, Exhibit A, pp. 64; 69; 74]. A nurse at Work Care diagnosed a "panic attack" and instructed Clanton to see her regular doctor. [Id. at p. 75]. That same she saw her doctor, who prescribed medication and "light duty". [Id. at pp. 64; 75].

Plaintiff began light duty on Monday, May 26. [Id. at p. 76]. Clanton alleges that Capt. Spaulding in Human Resources contacted Sergeant Joy Bellotte, her supervisor on light duty, requesting specific information about why plaintiff was on light duty and what restrictions it entailed. [Id. at pp 64-65]. Clanton further alleges that when she returned to her doctor and he put her on stress leave. [Id. at p. 65].

Plaintiff was on stress leave from April of 2002 until November of 2002. [Id. at p. 51]. During those six months, plaintiff received her regular pay. [Id. at p. 51]. Clanton testified that she spent a lot of time with her family, sat home and read a lot, and planned her wedding which took place on August 10, 2002. [Id. at p. 52-54]. The IAB complaint against Clanton was not timely investigated, so it was closed without any action being taken against Clanton. [Id. at p. 423-424; Exhibit A-66].

Upon her return from stress leave, Assistant Chief Franklin placed her in Area Three. [Franklin Affidavit, Exhibit E]. Chief Franklin's decision was based purely on the manpower needs of the department but also meant that she would not be working under Captain Melton or Sergeant Wilson. [Id.]

Clanton has continued working in Area Three, Shift C since November of 2002. [Clanton Deposition, Exhibit A, pp. 18; 20]. She admits that she has not been harassed or had any problems since she has been on that shift. [Id. at pp. 20 & 57].

Plaintiff claims that when she returned to work on November 1, 2002, she submitted a complaint to Jackie Willis in Internal Affairs against Captain Melton and Sergeant Wilson concerning the three-week period she worked in Area Four. [Id. at p. 118]. Clanton alleges that she met with Jackie Willis who told her the complaint would be investigated. [Id. at p. 118]. The complaint was not investigated, but was allegedly misplaced. [Id. at p. 119]. Willis explained that the 90-day time limit has passed, but that she was free to re-file the complaint. [Id. at p. 119]. Clanton did not re-file because Alderman and Melton had both retired, and Wilson had been transferred to Internal Affairs. [Id. at p. 119].

## LAW AND ANALYSIS

### A.  Summary Judgment Standard

Summary Judgment Standard

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); New

York Life Ins. Co. v. Travelers Ins. Co., 92 F.3d 336, 338 (5th Cir. 1996). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). See also Gunaca v. Texas, 65 F.3d 467, 469 (5th Cir. 1995). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 477 U.S. at 323-25, 106 S. Ct. at 2552). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." Little, 37 F.3d at 1075.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Wallace v. Texas Tech Univ., 80 F.3d 1042, 1046-47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. Little, 37 F.3d at 1075; Wallace, 80 F.3d at 1047. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Wallace, 80 F.3d at 1048 (quoting Little, 37 F.3d at 1075). See also S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996). The Court will not, "in the absence of any proof, assume that the nonmoving

party could or would prove the necessary facts." McCallum Highlands v. Washington Capital Dus, Inc., 66 F.3d 89, 92 (5th Cir. 1995), as revised on denial of rehearing, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id., 477 U.S. at 248, 106 S. Ct. at 2510.

## B. Gender Discrimination

COS contends that Clanton's only complaint of gender discrimination against Captain Alderman was her January 2002 transfer. [Clanton Deposition, Exhibit A, pp. 156-157]. COS further contends that this claim has prescribed. Clanton argues that she timely filed because Louisiana Revised Statutes 23:303(D) expands the prescriptive period.

Clanton's Equal Protection claims under 42 U.S.C. § 1983 are subject to a one-year prescriptive period. Drury v. U.S. Army Corps of Engineers, 359 F.3d 366 (5th Cir. 2004); La. Civ. Code art. 3492. Her claims pursuant to Louisiana Revised Statutes 23:301 et seq. are likewise subject to a one-year prescription. La. R.S. 23:303(D). Clanton's transfer to evening shift was effective on January 16, 2002, but she did not file the instant lawsuit until January 24, 2003 just outside the one year period. Clanton argues that the claim is timely filed.

Louisiana Revised Statutes 23:303(C) requires that employees and employers "make a good faith effort to resolve the dispute prior to initiating court action." Section 303(C) further prohibits filing of suit without 30 days written notice. Section 303(C) does not alter prescription periods. However, Section 303(D) does alter prescriptive periods, stating specifically:

> Any cause of action provided in this Chapter shall be subject to a prescriptive period of one year. However, this one-year period shall be **suspended during the pendency** of any administrative review or investigation of the claim conducted by the federal Equal Employment Opportunity Commission or the Louisiana Commission on Human Rights. No suspension authorized pursuant to this Subsection of this one-year prescriptive period shall last longer than six months.

COS argues that this section only applies if a plaintiff has filed for review by the EEOC or LCHR. Clanton argues that her internal complaint also suspends the prescriptive period.

With no guidance from the Louisiana courts, the Court must consider the statute's plain meaning. As COS points out, Section(D) was worded exactly the same under the prior statute.[3] When the Louisiana legislature added Section 303(C), it did not alter the wording, but was redesignated as Section 303(D). Furthermore, the legislature did not provide that prescription be suspended during either the 30 days period or the undefined period to resolve the matter before filing.

The Court finds that Section 303(C) does not suspend prescription. Furthermore, Clanton has not made a sufficient showing that Section 303(D) could apply to an internal investigation. Therefore, the Court finds that Clanton's claim of gender discrimination against Captain Alderman was untimely and, therefore, will be dismissed.

---

[3] The language was previously found in Section 23:333(C) which was repealed by Acts 1999, No. 1366, § 2.

## C. Gender-Based Hostile Environment

COS also moves for summary judgment dismissing Clanton's hostile work environment claim. To establish this claim Clanton must show that:

> 1) she belongs to a protected class; 2) she was subjected to unwelcome sexual harassment; 3) the harassment was based on sex; 4) the harassment affected a term, condition or privilege of employment; and 5) the employer knew or should have known of the harassment and failed to take remedial action.

Septimus v. Univ. of Houston, 399 F.3d 601, 611 (5th Cir. 2005). Furthermore, Clanton must show that the conduct was severe or pervasive. The alleged discrimination must have "created an environment that a reasonable person would find hostile or abusive." Id. Courts determine hostile environment considering the totality of the circumstances. Factors to consider include: "the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." Id.; see Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

In order to meet her burden, Clanton must show more than a few isolated incidents of gender based harassment. See Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir.1986). Instead, there must be a steady barrage of discriminatory comments. See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). A hostile work environment can only be found when the workplace is "permeated" by the offensive conduct. Id. Furthermore, Clanton's own subjective beliefs, however genuine, cannot form the basis of judicial relief. Nichols v. Lewis Grocer, 138 F.3d 563 (5th Cir. 1998); Little v. Republic Refining Co., 924 F.2d 93, 95 (5th Cir. 1991).

COS contends that Clanton's only complaints of gender-based discrimination are against Sergeant Cedric Wilson and Captain Alderman.[4] Clanton appears to allege that Sgt. Melton also discriminated against her based on her gender, but Clanton has not alleged any specific gender based comments made by Sgt. Melton.

Clanton alleges two incidents of discrimination by Sergeant Wilson: (1) all the units were called together to run a warrant but Clanton, the only female on the scene, was told she was not needed; and (2) Wilson invaded Clanton's "personal space", asking her if she had a problem with him and the way he supervised as well as telling her that she "looked like" she was "thinking" that she wanted to "get insubordinate." [Clanton Deposition, Exhibit A, pp. 152-153]. Clanton does not allege specific sexist or gender-related comments by Sergeant Wilson [Id. at p. 167] but she believes Wilson's actions were based on her gender. [Id. at p. 154]. She felt that he was trying to intimidate her with his size and his gender. [Id.] Clanton alleges that Sgt. Wilson would have treated a male officer in the same manner. [Id.]

COS argues that Clanton was not called to execute that particular warrant, and when she arrived there were already enough officers. [Wilson affidavit, Exhibit D]. Therefore, the decision was not based on gender, but on need. Furthermore, only three officers executed the warrant, thereby "excluding" all other officers on shift, both male and female. Clanton has not alleged that she was the only female on shift.

The alleged acts of discrimination do not concern any employment actions, therefore, the conduct complained of must be severe or pervasive to constitute actionable

---

[4]The claim against Alderman is dismissed as untimely. See supra, Part B.

discrimination. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998).

An employer is vicariously liable for "an actionable hostile environment created by a supervisor," but if no "tangible employment action, such as discharge, demotion, or undesirable reassignment" is taken, an employer can avoid liability by proving an affirmative defense of reasonable oversight and of the employee's unreasonable failure to take advantage of corrective opportunities. See Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, (1998).

Clanton claims that she complained about Sergeant Wilson and Captain Melton to Internal Affairs in November of 2002. Although Internal Affairs has no record of her complaint, Clanton admits that she was transferred out of Area Four and away from Sergeant Wilson. After November of 2002, Clanton admits that no one has harassed her or discriminated against her. [Clanton Deposition, Exhibit A, p. 20] Accordingly, the City should not be held liable since the harassment stopped once plaintiff complained. See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998).

The Court finds that summary judgment dismissing Clanton's hostile-work environment claim is proper as a matter of fact and law. Clanton has not provided sufficient evidence to meet the "severe and pervasive" standard. Furthermore, Clanton admits that the harassment has ceased.

## D. Retaliation

COS also moves for summary judgment dismissing Clanton's retaliation claims. Clanton asserts retaliation claims pursuant to Louisiana state law, specifically under Louisiana Revised Statutes 51:2256 and Louisiana Revised Statutes 23:967. This Court has recently followed other courts in holding that Title 51 no longer provides a retaliation cause of action to employment discrimination plaintiffs. See, LaCaze v. W.W. Grainger, Inc., 2005 WL 1629936 (W.D. La. 2005), (citing Smith v. Parish of Washington, 318 F.Supp.2d 366 (E.D. La. 2004)). Therefore, Clanton's retaliation claim pursuant to Louisiana Revised Statutes 51:2256 will be dismissed.

Clanton also alleges a retaliation claim under Louisiana's "whistleblower statute", Section 967 of Title 23. Louisiana courts look to federal jurisprudence when construing Louisiana's retaliation statute. Smith v. AT & T Solutions, Inc., 90 Fed. Appx. 718, 723 (5th Cir. 2004). To establish a *prima facie* case on her retaliation claims, Clanton must show (1) that she engaged in protected activity; (2) that she suffered an adverse employment action; and (3) that a causal connection exists between the protected activity and the adverse employment action. Id.; Fierros v. Tex. Dep't of Health, 274 F.3d 187 (5th Cir. 2001). Clanton alleges that she engaged in two activities protected under Section 967: (1) disclosing violations of state law to her employer and the Police Association and (2) objecting to acts and practices that violate state and federal law as well as a federally imposed Consent Decree.[5] COS does not contest that these actions were protected activities under Section 967, but does contest whether adverse action was taken against Clanton and whether a causal connection exists.

---

[5]The consent decree referred to is entered in United States v. City of Alexandria, 614 F.2d 1358 (5th Cir. 1980).

1. Adverse Action

Clanton's adverse actions are not easily discernable. COS has narrowed the actions to two different "time periods" of adverse action: (1) January to May 2002, resulting in Clanton's stress leave and (2) after October 14, 2002, upon return from stress leave Clanton was transferred from day shift to evening shift. Clanton did not dispute this characterization in her opposition. COS argues that neither the cumulative affect of occurrences nor the transfer constitute "adverse action" or "reprisal" under Section 967.

"Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." Green v. Administrators of Tulane Educational Fund, 284 F.3d 642, 657 (5th Cir. 2002) Thus, "changing locks, restructuring office procedures, clarifying job duties, and taking disciplinary actions in the form of reprimands[ ] do not constitute ultimate employment decisions." Id. at 657-58.

In Mattern v. Eastman Kodak Company, 104 F. 3d 702 (5th Cir. 1997), the Fifth Circuit found that hostility displayed by fellow employees, having tools stolen, supervisors visit the plaintiff's home after she called in sick, a verbal threat of being fired, a reprimand for not being at her assigned station, a missed pay increase, and being placed on final warning, did not constitute actionable employment actions. As the court in Mattern noted:

> To hold otherwise would be to expand the definition of 'adverse employment action' to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee– anything which *might* jeopardize employment in the future. Such expansion is unwarranted.

Mattern, 104 F.3d at 708 (emphasis in original). Another Fifth Circuit case, Dollis v. Rubin, 77 F. 3d 777, 781-82 (5th Cir. 1995), held that the employee's allegations that she was not

considered for a promotion, was not permitted to attend a training conference, had her work criticized by government vendor, was given false information regarding the aspects of her employment, and was denied a desk audit were not actionable adverse actions.

Section 967(C) defines "reprisal" as:

(1) "Reprisal" includes firing, layoff, loss of benefits, or any discriminatory action the court finds was taken as a result of an action by the employee that is protected under Subsection A of this Section; however, nothing in this Section shall prohibit an employer from enforcing an established employment policy, procedure, or practice or exempt an employee from compliance with such.

Clanton argues that reprisal pursuant to Section 967 should not be held to the same strict standard for Title VII "adverse actions" as stated in Mattern. Clanton also argues that Brooks v. Southern University, 877 So.2d 1194 (La. App. 4 Cir. 7/14/04), cited by COS, is inapplicable because the retaliation claim in Brooks was under Title VII, not Section 967. The Court agrees that the Brooks court did not specifically state which retaliation statue it was applying. However, the petition of the Brooks plaintiff indicates claims under Louisiana law only. Nevertheless, there is no indication in the opinion that Section 967 was interpreted. Therefore, the Court will not use Brooks as an example of Louisiana courts interpreting Section 967 as Title VII claims. On the other hand, Clanton has not provided the Court any Louisiana cases that apply Section 967 differently than Title VII.

Clanton also asks the Court to follow the precedent of other federal appellate circuits that provide a more expansive interpretation of adverse employment actions. In addition, Clanton argues that Louisiana uses the "deterrence" standard, but she cites no Louisiana authority for this standard. Clanton is correct that Louisiana courts can, have and will continue to reject federal interpretation of Louisiana statutes. However, this Court

is bound by the Fifth Circuit Court of Appeals. As Clanton has provided no Louisiana authority to the contrary, the Court will follow Fifth Circuit precedent and the Mattern standard for "adverse actions." None of the conduct of which plaintiff complains concerns tangible employment actions. Accordingly, plaintiff has failed to make even a *prima facie* claim of retaliation.

2.  Causal Connection

Even if Clanton could establish an adverse employment action, she still must prove a causal link between that conduct and her protected activities. Clanton must produce at least some evidence that the decisionmakers had knowledge of her protected activity. Manning v. Chevron Chem. Co. LLC, 332 F.3d 874, 883 n. 6 (5th Cir. 2003) (citing Medina v. Ramsey Steel Co., Inc., 238 F.3d 674, 684 (5th Cir. 2001)). As the Fifth Circuit held in Manning: "If the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity." 238 F.3d at 883, n.6; see also Chaney v. New Orleans Pub. Facility Mgmt., Inc., 179 F.3d 164, 168 (5th Cir.1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct.").

There are three separate decisionmakers at issue in this case. The decisonmakers for the accumulated actions from January to May of 2002 was Melton and/or Wilson. The decisionmaker for the transfer in November 2002 was Assistant Chief Franklin.

COS contends that Assistant Chief Franklin, the decisionmaker, did not know of Clanton's alleged protected activity at the time that he transferred Clanton. Clanton alleges that Franklin was friends with Alderman and was "influenced" by Alderman. Clanton also alleges that Melton, Wilson and Alderman were friends. Clanton further alleges it to be unlikely that captains would not have some communication when an officer was transferred from one unit to another. However, unsubstantiated beliefs are not enough to survive summary judgment.

Clanton's only piece of evidence that Capt. Melton may have known about her complaints, is from a conversation when she first began on his shift. Melton allegedly told her, "I don't know everything or exactly what's going on, and I really don't' give a shit. Don't bring your problems here." [Clanton Deposition, Exhibit A, p. 165]. Assuming this statement is true, it still does not indicate that Melton knew about Clanton's complaints about Alderman constituting protected activities. In fact, the conversation relied on by Clanton indicates that Melton did not know about the complaint. Melton's affidavit states that he, in fact, did not know that she had filed a complaint against Alderman.

Clanton's only "evidence" that Cedric Wilson knew about her prior complaints is also indirect. Clanton claims that Wilson had a "hostile attitude" from the "first second that we met." [Id. at p. 166]. She also alleges that he micro-managed her work and talked to her in a hostile and condescending tone. Again, this is not sufficient evidence to indicate that Wilson knew about her complaint.

Because Clanton has not established that any of the decisionmakers in this matter knew about her complaint, therefore she has not established a casual connection between her protected activities and any possible adverse action.

3.  Conclusion

Clanton has not established a *prima facie* claim of retaliation, therefore summary judgment is proper as a matter of fact and law. Clanton has not established an adverse action or a causal connection. Furthermore, the Court finds there is no retaliation under Title 51 of the Louisiana Revised Statutes.

### CONCLUSION

The Court finds that Clanton has not provided sufficient evidence to survive summary judgment. There are no genuine issues as to any material fact. Clanton's gender discrimination claim against Alderman is prescribed. There is no cause of action for retaliation in Title 51 of the Louisiana Revised Statutes. Clanton has not established a claim for hostile work environment or retaliation. Summary judgment in favor of the City of Shreveport, dismissing plaintiff's claims, is proper as a matter of fact and law.

Therefore:

IT IS ORDERED that defendant City of Shreveport's ("COS") "Motion for Summary Judgment" [Doc. No. 21] shall be **GRANTED**.

IT IS FURTHER ORDERED that plaintiff's claims shall be **DISMISSED WITH PREJUDICE.**

Shreveport, Louisiana, this __ day of November, 2005.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE